UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PETER LUNDE,

                                                              Plaintiff,

    v.                                                                      1:10-CV-927
                                                                                   (LEK/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                                               Defendant.
_____

GEORGE P. FERRO, ESQ., for Plaintiff
SHEENA V. WILLIAMS-BAR, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

      This matter was referred to me for report and recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

      Plaintiff filed an application for Supplemental Security Income (SSI), claiming disability since September 1, 2005.[1] (Administrative Transcript ("T.") at 33-45). Plaintiff's application was denied initially on January 17, 2006. (T. 25), and he requested a hearing before an ALJ (T. 30-31). The hearing, at which plaintiff testified, was conducted on February 5, 2008. (T. 289-97).

      In a decision dated April 14, 2008, the ALJ found that plaintiff was not

---

[1] Plaintiff appears to have chosen September 1, 2005 as the date that he became disabled because his wife was living with him until August 2, 2005, and their combined income would have made plaintiff ineligible for SSI benefits. (T. 44) (Plaintiff's Application for SSI).

disabled. (T. 18-24). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on May 28, 2010. (T. 3-6).

## II.   ISSUES IN CONTENTION

The plaintiff makes the following claims:

1. The ALJ's Residual Functional Capacity (RFC) determination is not supported by substantial evidence. (Pl.'s Mem. at 3-4).

2. The ALJ failed to properly determine that plaintiff could perform jobs that exist in significant numbers in the national economy. (Pl.'s Mem. at 5).

This court concludes for the reasons below that the ALJ's decision is supported by substantial evidence, and recommends that the complaint be dismissed in its entirety.

## III.   APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be

>hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. § 404.1520 and in 416.920 to evaluate disability insurance and SSI disability claims.

>First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps.  However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step.  *Id*.

    **B.**    **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may

not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

    A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

    "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*.  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV.  MEDICAL EVIDENCE

On December 3 2002, plaintiff was admitted to St. Clare's Hospital, after going to the emergency room with fever, chills, body aches, and cough that lasted for more than three days. (T. 115).  Although plaintiff's emergency room visit was for pneumonia-like symptoms, his blood pressure dropped, his heart rate rose to 140 beats per minute, and he had atrial fibrillation. *Id.*.  He was given Dopamine and Zosyn and transferred to the intensive care unit, where the atrial fibrillation was controlled with Cardizem. *Id.*  During his stay at the hospital, plaintiff was given a variety of laboratory and other tests, including x-rays, ultrasounds, and a CT scan of his head. (T. 118-39).

Various consultants participated in his care to determine his diagnoses and his discharge plan. (*See* T. 171-82).  One of the consulting physicians noted that plaintiff was a smoker and was "evolving some pulmonary symptoms." (T. 171).  At the time of plaintiff's discharge, he continued to suffer from atrial fibrillation. (T. 114). Plaintiff's discharge plan included a follow-up with a cardiologist to determine whether to begin Coumadin[2] treatment.  He later began Coumadin treatment and underwent periodic follow-up tests at St. Clare's Hospital for the progress of this treatment. (T. 142-51).

Plaintiff had a pulmonary function test and an echocardiogram on May 20,

---

[2] Coumadin, a brand name for Warfarin, is an anticoagulant.  It used to prevent blood clots from forming in the blood vessels.  It is also prescribed for individuals who have irregular heartbeat. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000634.

5

2003. (T. 152, 154-55). He had a chest x-ray on May 21, 2003 for his "SOB."[3] (T. 153). The x-ray showed "[m]inor bullous changes" with "no other findings." (T. 111, 153). The results of the echocardiogram showed mildly dilated aortic root, severe left atrial enlargement, normal LV size and systolic function, and trace tricuspid regurgitation. (T. 112-13, 154-55). There were no changes from the test that was done in December of 2002. (T. 154-55, 169-70). The pulmonary function test showed a "minimal obstructive lung defect" and "a mild restrictive lung defect" at that time, with an insignificant response to the brochodilator. (T. 152).[4]

The record also contains progress notes from January 10, 2003 to September 23, 2005 from Schenectady Family Heath Services. (T. 183-222). These records cover a variety of conditions, including an infection that plaintiff had in 2005 in his hand. (T. 183-90). On June 4, 2003, the progress note stated that plaintiff's shortness of breath was somewhat improved, he was tolerating all his medications well, and he was in "good compliance." (T. 207). By July of 2003, however, the progress notes indicated that there was "still significant dyspnea on exertion despite combivent." (T. 204). Plaintiff was instructed to follow up with Dr. Patel to discuss his plaintiff's test results. (T. 205). The note also indicated that plaintiff had quit smoking six months before. *Id.* His atrial fibrillation was "controlled with Cardizem." (T. 205).

On January 1, 2004, plaintiff complained of increased shortness of breath with exertion and was wheezing and coughing; however, he had not followed up with Dr.

---

[3] Shortness of breath, also referred to as "dyspnea."

[4] A duplicate of this report appears at page 157 of the administrative record. (T. 157).

Patel. (T. 200). The note still reported "mild" obstructive lung disease, and the doctor's plan was to "add combivent." (T. 201). The note also indicated that plaintiff was not smoking. (T. 200). The note also indicated that plaintiff needed to follow up with Dr. Manor for plaintiff's atrial fibrillation. (T. 201). Plaintiff reported that his mood was worsening. (T. 200).

In May of 2004, the progress note stated that plaintiff had been experiencing frequent spells of lightheadedness, lasting for several seconds at a time, and resolving spontaneously when plaintiff sat down. (T. 196). The plaintiff was responding moderately to Wellbutrin for his depression, and he was going to be referred to the cardiology department to schedule "cardioversion"[5] for his atrial fibrillation. (T. 197). The record still indicated that plaintiff was not smoking. (T. 196).

On September 29, 2004, the progress notes state that plaintiff was "generally feeling the same dyspnea with exertion, his mood was improved despite stopping the Wellbutrin, and he was still getting lightheaded. (T. 192). Plaintiff had obtained a second opinion about the cardioversion and was "still reluctant" to undergo the procedure. (T. 192). Plaintiff had resumed medication for the atrial fibrillation, and he was continuing his Coumadin protocol. (T. 193). His Cronic Obstructive Pulmonary Disease (COPD) was "stable," and plaintiff was attempting to obtain medication samples. (T. 193). The September 29, 2004 report also indicated that plaintiff was

---

[5] Cardioversion is a medical procedure used to restore the normal rhythm of the heart. http://www.mayoclinic.com/health/cardioversion/MY00705. This procedure involves sending electric shocks to the heart through electrodes placed on the patient's chest. *Id.*

7

smoking one and one half packs of cigarettes per day.[6]

Plaintiff had surgery in November of 2004 for a lateral tibial plateau fracture of his right knee. (T. 81-94). He underwent an open reduction and lateral fixation with a right knee meniscus repair. (*See* T. 83). Other than the records of plaintiff's knee surgery, there appear to be no medical records until August 10, 2005, when plaintiff complained of a boil on his left elbow and increasing pain in his right knee. (T. 190-91). The progress note indicates that plaintiff was still smoking one and one half packs of cigarettes per day. (T. 190). Because the report focused on plaintiff's hand infection, there was only brief mention of his COPD and his atrial fibrillation. (T. 190). The progress note stated only that a follow up was necessary "on meds - Afib - COPD." *Id.* The next six progress notes mention only plaintiff's hand. (T. 186-89, 252-56(a)[7]) (notes dated September 21, 22, 23, 2005 and June 20, 22, 2006, and July 20, 2006).

On November 18, 2005, plaintiff was consultatively examined by Dr. Vincent Luvera, D.O. (T. 224-28). Plaintiff completed a pulmonary function test and an echocardiogram in conjunction with the consultative examination. (T. 229-36). Dr. Luvera noted in plaintiff's "Social History" that plaintiff "smokes 2 packs of cigarettes per day and has done so since he was 11 years of age." (T. 225). Dr. Luvera stated

---

[6] It is unclear whether plaintiff stopped smoking for a period of time and then began smoking again. This is particularly confusing because the consultative physician stated in his report that plaintiff told him that he smoked two packs of cigarettes per day since the age of 11, with no indication that he ever quit for a period of time. (T. 225). Plaintiff did not testify that he ever quit smoking for any length of time.

[7] The page that follows 256, and should be numbered 257, is blank, and the following page is numbered 257. Thus, the court will cite the blank page as 256(a).

that plaintiff was able to cook, clean, do laundry, and shop without assistance. (T. 225). Plaintiff could take care of his personal needs and drive without assistance. *Id.*

Plaintiff was not in any acute distress, his gait was normal, and although he had some discomfort in his right knee, he could perform a full squat. *Id.* An examination of his chest revealed "diffuse sonorous rhonchi bilaterally without wheezing." (T. 226). The "AP" (anterior/posterior) diameter of the chest was normal, and plaintiff had normal diaphragmatic excursion. (T. 226). Plaintiff's heart revealed an irregular rhythm, however, no appreciable murmur was heard, and no gallops or rubs were audible. *Id.* Plaintiff's musculoskeletal exam was normal, and his mental status screen was normal. (T. 226-27). The pulmonary function test showed "[m]oderately severe obstructive process," and the echocardiogram showed left ventricular hypertrophy with preserved left ventricular function. (T. 227, 236).

Dr. Luvera found that plaintiff's moderately severe obstructive pulmonary disease was most likely irreversible and would continue to progress as long as he continued to smoke. (T. 228). Plaintiff's limitations were primarily based upon his respiratory status "for which he is able to function fairly well at this particular point in time, but does have some visual SOB even while at rest." *Id.* The doctor stated that this would only get worse as time progressed. However, any other limitations were "mild to moderate." *Id.* Dr. Luvera also found that plaintiff's atrial fibrillation and his knee impairment were "not . . . significantly limiting factors with regard to his ability to function on a daily basis." *Id.*

In January of 2006, a non-examining disability analyst completed a Residual

9

Functional Capacity evaluation, finding that plaintiff could perform medium work. (T. 238-43).

## V. TESTIMONY and NON-MEDICAL EVIDENCE

Born on May 15, 1959, plaintiff was 48 years old at the time of the ALJ's hearing. (T. 18). Plaintiff testified that he last worked as a security guard, but stopped working in 2001 or 2002 because of his cardiac condition.[8] (T. 290). He has a high school equivalency diploma. (T. 297). He testified that he lived in a house with his children. (T. 290). Plaintiff stated that he suffered from shortness of breath, but was trying to quit and was "down to" a pack per day. (T. 291). He has trouble sleeping because of his breathing problems. (T. 291-92). Plaintiff stated that he used a Combivent inhaler.

Plaintiff testified that because of his atrial fibrillation, he got "pains in his chest all the time." (T. 292). He also stated that he still has pain in his knee due to his 2004 knee surgery, but the doctor would only give him Ibuprofen for the pain. (T. 293). Plaintiff testified that he could only stand for four to five minutes at a time and that just walking from the bus stop to the location of the hearing caused him to be out of breath. (T. 294). He could not estimate how far he could actually walk. *Id.* Sitting, however, was not a problem. (T. 294). Plaintiff testified that he did the grocery shopping, some cooking, and vacuumed "a little," but sat down to do it. (T. 294-95). Plaintiff also stated that he watched a lot of T.V., slept a lot, and would "just lay down" when he got out of breath. (T. 295). During the questioning by plaintiff's

---

[8] *See* fn.1 above for a discussion of why plaintiff has chosen a September 1, 2005 onset date.

attorney, plaintiff testified that he also took the blood thinner, Coumadin, and a pill for his blood pressure. (T. 296).

## VI. ALJ'S DECISION

The ALJ found that plaintiff has three "severe" impairments: atrial fibrillation, chronic obstructive pulmonary disease (COPD), and status post right knee surgery with full range of motion. (T. 19, 23). However, the ALJ found that none of these impairments, singly or in combination, rose to the severity of a listed impairment. *Id.* The ALJ then determined plaintiff's residual functional capacity and determined that plaintiff could still perform a full range of sedentary work, despite his severe impairments. The ALJ gave great weight to the opinion of Dr. Vincent Luvera, M.D., who examined plaintiff in November of 2005, determining that plaintiff's limitations were due to his respiratory status only, and finding that his atrial fibrillation and his knee impairment were not "significantly limiting factors." (T. 228). The ALJ also pointed out that plaintiff continued to smoke two packs of cigarettes per day at that time. *Id.*

In determining that plaintiff could perform sedentary work, the ALJ relied on plaintiff's own statements that he could perform a full range of activities of daily living, including cooking, cleaning, shopping, and caring for his three children. (T. 21). As a result of the ALJ's determination that plaintiff had the RFC to perform "substantially all of the full range of sedentary work," but could not perform his prior work, the ALJ proceeded to Step 5 of the evaluation. He applied the Medical Vocational Guidelines to determine that plaintiff was not disabled, based upon his age,

education, and previous work experience. (T. 22-23). The ALJ, thus, found that plaintiff was not under a disability. *Id.*

## VII. ANALYSIS

Plaintiff's two arguments are both related to the ALJ's determination that plaintiff could perform a "full range" of sedentary work, based both on medical findings and upon a rejection of any of the plaintiff's statements to the contrary. (Dkt. No. 7).

### A. Commissioner's Burden at Step Five

Once the plaintiff shows that he cannot return to his previous work, the Commissioner must determine that the plaintiff retains the Residual Functional Capacity (RFC) to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004) (citation omitted). In the ordinary case, the ALJ meets this burden by utilizing the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. § 404.1567(a). Each exertional category of work has its own Grid. The Grid for each exertional category then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

Where a plaintiff's impairments are only exertional, the Grids may be used exclusively. *Id.* However, exclusive reliance on the Grid is not appropriate if the medical vocational guidelines "fail to adequately describe a claimant's particular limitations." *Id. See* 20 C.F.R. Part 404, Subpt. P, App. 2, 200.00(e). Where there are "discrepancies" between the claimant's abilities and the Grid factors, where the claimant's exertional impairments are compounded by non-exertional impairments that significantly limit the range of work an individual can perform, or where there is no substantial evidence that a claimant can perform the full range of a particular category of work, then the relevant facts are to be considered in light of the vocational considerations outlined in the regulations at 20 C.F.R. § 416.969(a). If a claimant cannot perform the full range of an exertional category of work, then an individual assessment, using the services of a Vocational Expert, may be required. *Zorilla*, 915 F. Supp. at 667 (citing *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989)).

In this case, the ALJ's found that plaintiff could perform the full range of sedentary work, and then used the Medical-Vocational Guidelines to determine that plaintiff was not disabled. (T. 21-23). Plaintiff argues that the ALJ's determination that plaintiff has the RFC to perform the full range of sedentary work is not supported by substantial evidence. Plaintiff's counsel argues that the ALJ did not take into account plaintiff's shortness of breath, the "significant pain" in his right knee, or the fact that he becomes "light-headed" as a result of his cardiac impairment.

The ALJ specifically stated that plaintiff's exertional ability has not been significantly compromised by any non-exertional impairments. (T. 23). The court

must point out that there is very little medical evidence in this case past 2006. Plaintiff claims that he cannot afford to go to the doctor, and thus, should not be penalized because he cannot afford to obtain medical reports. However, a review of the consultative physician's report in 2005, shows that notwithstanding plaintiff's shortness of breath, he could perform a variety of activities of daily living, and that his limitations were only due to his COPD. Dr. Luvera also found that plaintiff's atrial fibrillation, his knee pain, and any "lightheadedness" were not significantly limiting factors. The ALJ was entitled to rely upon Dr. Luvera's consultative examination. It was not contradicted by any other medical evidence of record.

It must also be noted that plaintiff also continued to smoke two packs of cigarettes per day. Even by the time of the ALJ's hearing, plaintiff was still smoking at least one pack per day, although he professed to attempting to quit. The court notes in 2003, the pulmonary function test indicated "minimal obstructive lung defect" and "mild restrictive lung defect." (T. 152). In 2004, when plaintiff had his knee surgery, one of the physicians stated that plaintiff had "mild COPD." (T. 79). Plaintiff continued to smoke, however, and by November of 2005, plaintiff had a "moderately severe obstruction." (T. 230). In 2005, Dr. Luvaro stated that plaintiff's condition was "irreversible" and would continue to progress as long as he continued to smoke. (T. 228). A breathing problem that is aggravated by plaintiff's own conduct is not disabling. *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983).

At the hearing, plaintiff testified that sitting did not bother him. (T. 294). He

also stated that he could lift a grocery bag weighing 5-10 pounds.[9] *Id.* The ALJ specifically considered the requirements of sedentary work, and found that plaintiff could perform substantially all of these requirements. (T. 21). In this situation, the respiratory impairment affected plaintiff's exertional abilities. Thus, the shortness of breath was considered in making the determination that plaintiff was limited to sedentary work in the first place. Even assuming that the shortness of breath was considered a non-exertional impairment, the result would be the same. The ALJ found that plaintiff's shortness of breath would not substantially limit the range of *sedentary* work he could perform. Finally, the ALJ relied upon Dr. Luvera's opinion that the atrial fibrillation and whatever residual pain plaintiff suffered from his knee repair would not significantly limit his ability to function on a daily basis. (T. 21). Because they are not "significantly limiting factors," they would not reduce the range of sedentary work that plaintiff is able to perform, and the ALJ's use of the Grids was supported by substantial evidence.

### B. Pain and Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96

---

[9] Sedentary work requires that the plaintiff be able to lift no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, legers, or small tools. 20 C.F.R. § 416.967 (a).

CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

Plaintiff's counsel argues that the ALJ did not give sufficient reasons for doubting plaintiff's credibility regarding his pain. Plaintiff's knee surgery was performed in November of 2004, and in November of 2005, Dr. Luvera stated that there was no history of effusion or limitation as a result of the knee impairment. (T. 224). Plaintiff denied any instability, and a musculoskeletal examination showed that, although plaintiff complained of some pain in his knee, he was able to perform a full squat, his gait was normal, and he had full flexibility and strength in his lower extremities. (T. 226-27). The ALJ is entitled to rely upon the consultative physician's opinion, particularly when there is no contradictory medical evidence in the record. *Edwards v. Astrue*, No. 5:07-CV-898, 2010 WL 3701774, at *11 (N.D.N.Y. Sept. 16, 2010) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995)).

Plaintiff's testimony that he could only stand for four to five minutes (T. 294) is belied by his other testimony that he took the bus and did his own grocery shopping, among all the other household chores that he admitted doing. He also testified that sitting did not bother him, and that he could lift the weight required for sedentary work. Thus, the ALJ's finding that the plaintiff was not completely credible is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be **AFFIRMED** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file

written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: June 6, 2011

*[signature: Andrew T. Baxter]*
Hon. Andrew T. Baxter
U.S. Magistrate Judge